# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

HEATHER WANKE,           )
                             )
**Plaintiff,**               )
                             )
**v.**                         )         **Case No. 3:19-cv-0692**
                             )         **Judge Aleta A. Trauger**
**INVASIX INC. and INMODE LTD.,**   )
                             )
**Defendants.**              )
                             )

## MEMORANDUM

Defendants Invasix Inc. ("Invasix") and InMode Ltd. ("InMode") have filed a Motion for Summary Judgment (Doc. No. 93), to which Heather Wanke has filed a Response (Doc. No. 107), the defendants have filed a Reply (Doc. No. 112), Wanke has filed a Sur-Reply (Doc. No. 116), and the defendants have filed a Sur-Sur-Reply (Doc. No. 119). Wanke has filed a Motion to Strike Summary Judgment Evidence and Objection (Doc. No. 103), to which the defendants have filed a Response (Doc. No. 111). For the reasons set out herein, the defendants' motion will be granted in part and denied in part, and Wanke's motion will be denied.

## I. BACKGROUND

This case involves a medical device manufactured, marketed, and/or sold by the defendants under the name "Fractora." It is used on the skin for cosmetic purposes. A detailed account of the regulatory environment surrounding the sale and marketing of the Fractora as a medical device, combined with allegations by Wanke of various instances of wrongdoing, can be found in the court's Memorandum of May 19, 2020. (Doc. No. 87 at 1–8.) In short, Wanke alleges that the defendants marketed the Fractora improperly, including by encouraging its operation by

unqualified personnel and/or in unsafe ways, leading to the device's inflicting permanent injuries on some patients.

Wanke alleges that she was injured by a Fractora procedure performed on her face by Dr. Paulino E. Goco on June 15, 2017. On January 23, 2019, Wanke and others with similar allegations entered into a Tolling Agreement with Invasix "and any other related and affiliated corporations and businesses" covering potential claims related to Fractora. On April 17, 2019, a day before the Tolling Agreement was to expire, Wanke filed her claims in the U.S. District Court for the Central District of California, which later transferred the claims here. (Doc. No. 1; Doc. No. 80-4; Doc. No. 107[1] ¶¶ 1–2, 24–25.) At issue with regard to the current motion is whether those claims were timely filed, which, as the court will discuss later in this opinion, may depend in part on the details of when Wanke became or should have become aware that she had suffered a wrongful injury, rather than the intentional, controlled physical damage inflicted during a successful Fractora procedure.

Wanke described the period immediately following her procedure as follows:

55. Dr. Goco told Heather to expect less than five days downtime[,] so Heather knew something had gone terribly wrong when she remained swollen with puncture mark wounds all over her face at day 3 and 4 of her recovery. She remained housebound at day 7. Her skin looked even worse beginning at day 10—as the swelling subsided, Heather's smooth, clear skin came to look and feel like orange peel, the skin under her eyes darkened[,] and burns left [claw- and moon-shaped scarring] on her cheeks, upper lip and chin and between her brow[s].

56. Dr. Goco shared Heather's concern, requiring multiple follow up appointments. In notes from July 12, 2017, Dr. Goco noted "hyperpigmentation." He repeated a VISIA Facial Assessment Report on Heather that same day. As compared to an assessment taken June 9, 2017, just before the Fractora procedure, Heather's skin

---

[1] For reasons that will be explained in this opinion, Wanke's Response to the defendants' Statement of Undisputed Material Facts (Doc. No. 105) includes two numbered sets of paragraphs—the first, representing assertions by the defendants, and the second, representing assertions by Wanke. When the court cites this document, a citation to a paragraph without a page number will refer to the first set of numbered paragraphs. If a page number is included, the citation is to the second set of paragraphs.

2

scored 60-90% worse in assessments including "spots," "wrinkles," "texture" and "pores."

57. Heather cried and cried in Dr. Goco's treatment room. Neither the doctor nor his staff could console her. Dr. Goco became so alarmed at Heather's distress, he left a personal voice mail message for her after the July 12, 2017 appointment. In it, Dr. Goco acknowledged that Heather would need multiple additional treatments to address the injuries sustained as a result of the Fractora treatment.

(Doc. No. 1 ¶¶ 55–57.)

Wanke filed her April 17, 2019 Complaint with two co-plaintiffs, Mia Jones and Janice Newman, in the Central District of California. (Doc. No. 1.) That Complaint named only Invasix as a defendant. (*Id.* at 1.) On June 28, 2019, Invasix filed a Motion to Sever and Transfer Plaintiffs' Claims. (Doc. No. 20.) Invasix noted that Wanke and Jones were Tennessee residents who had procedures performed on them in Tennessee, while Newman was a New York resident whose Fractora procedure was performed in New York. Moreover, Invasix argued, each plaintiff's claims involved unique questions regarding each patient's treatment, rendering joinder inappropriate. (Doc. No. 20-1 at 9.) The plaintiffs opposed the motion, arguing that their claims were based on the same course of wrongdoing by Invasix and that the Central District of California was the most convenient forum for key non-party witnesses. (Doc. No. 28 at 3, 14.) The court granted both of Invasix's requests, severing the plaintiffs' cases and transferring each case to the plaintiff's home district—that being, in Wanke's case, the Middle District of Tennessee. (Doc. No. 36.)

On October 22, 2019, Wanke filed an Amended Complaint, adding InMode as a defendant. (Doc. No. 58 at 1.) On February 27, 2020, Invasix and InMode filed separate Motions to Dismiss, each of which alleged that Wanke's claims were barred by the relevant statutes of limitations (and InMode's arguing, in addition, that service of process on that company, which is based in Israel, was ineffective). (Doc. Nos. 67 & 69.) While those motions were pending, Wanke filed a Motion for Leave to File Amended Complaint. (Doc. No. 73.) The proposed Second Amended Complaint

3

included several new paragraphs under the heading "Facts Concerning Statute of Limitations," the first of which explained as follows:

> The Fractora procedure involves the intentional destruction of tissue so that new collagen will form, tightening and otherwise resurfacing the skin. All Fractora patients experience an injury and [patients] heal at different rates. Plaintiff was told by her treating physician that her procedure had gone normally and that her skin was and would continue healing. Subsequently, another physician told Plaintiff that she could expect her skin to continue healing for up to a year and that it would be impossible to determine whether she had any actual injury (as opposed to the intentional tissue damage and expected healing time for the Fractora) for at least a year after the procedure. Thus, based on a doctor's expert opinion, Plaintiff did not and could not through exercise of reasonable diligence [have] known she suffered a cognizable injury as a result of the Defendant's wrongful conduct until June 15, 2018.

(Doc. No. 89 at 2–3.) Wanke also excised her previous description of the days following her procedure, in which she described knowing that something had gone awry nearly immediately and tearfully complaining to Dr. Goco, who shared her concerns. (*See* Doc. No. 107 ¶¶ 8, 14 (conceding that relevant paragraphs were removed).)

On May 19, 2020, the court entered a Memorandum and Order, granting Wanke leave to file the Second Amended Complaint. (Doc. Nos. 87–88.) In a footnote, the court noted that, despite the "complicated and at times challenging" choice-of-law questions potentially posed by the situation, neither party had, at that point, "suggest[ed] that any statute of limitations other than Tennessee's one-year limit should apply here." (Doc. No. 87 at 18 n.6.) The court therefore treated that issue as conceded for the purposes of the motions to dismiss and proceeded under Tennessee's one-year limitations period mandated for claims based on personal injury, Tenn. Code Ann. § 28-3-104(a)(1)(A), including product liability actions, Tenn. Code Ann. § 28-3-104(b). (*Id.*)

The court then considered the question of when to begin calculation of the one-year period under Tennessee's "discovery rule," which provides that a cause of action accrues "when the

plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant." *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 532 (Tenn. 1998) (citations omitted). The court noted that "[a]pplying the discovery rule to an injury caused by a medical procedure or treatment is often difficult, because medical intervention can involve significant pain and suffering even when no wrongfulness occurs." (Doc. No. 87 at 21.) That was particularly true here, the court observed, because "the very premise of her Fractora procedure [is], in a sense, to injure [the patient]—to inflict controlled, planned damage to [the patient's] tissue in order to cause a particular desired biological result." (*Id.*)

The court also acknowledged that "Wanke's original Complaint and Amended Complaint at the very least come close to admitting that she knew or should have known that she was injured by wrongful conduct more than a year before she entered into the Tolling Agreement or filed her claims." (*Id.* at 21.) Nevertheless, the court noted that "[t]he relevant language of the complaints . . . appears not to have been drafted with a consciousness of how determinative the issue ultimately could be." (*Id.* at 21–22.) The court concluded that the factual nature of the discovery rule inquiry was sufficient to avoid outright dismissal or a conclusion that amendment would be futile. (*Id.* at 22.) The court did, however, express its serious concern that Wanke's actions in this litgation could amount to bad faith:

> Wanke is not seeking leave merely to add some omitted fact or correct an earlier understandable misstatement. To the contrary, Wanke seeks to substantially revise—and arguably contradict—a factual claim that she made in her two earlier complaints and could not plausibly have been innocently mistaken about. Wanke claimed twice that she knew that "something had gone terribly wrong" almost immediately following her procedure. (Docket No. 1 ¶ 55; Docket No. 58 ¶ 54.) She described tearful conversations with her physician confirming the severity of the situation. (Docket No. 1 ¶ 57; Docket No. 58 ¶ 56.). Now, however—after it has been pointed out that those facts lend support to a statute of limitations defense against her claims—she seeks to assert that, rather than immediately knowing

something had gone wrong, she spent a year reasonably believing that she needed only to wait for her injuries to heal normally and only then could she have realized she had suffered a compensable injury. . . . Twice now, Wanke has asserted facts, in signed complaints, that arguably present problems for the survival of her claims. They were facts about her own knowledge and experience and about which, therefore, she had no reason to be confused. She has, moreover, offered little by way of a persuasive explanation for why she would seemingly change her story, other than her counsel's having now realized the dangers posed by her earlier statements.

(*Id.* at 27–29.) Nevertheless, the court, with significant reservations, allowed the amendment, leaving the issue of timeliness to be determined at a later date. (*Id.* at 30.)

On July 16, 2020, the defendants filed a Motion for Summary Judgment, raising the issue again. (Doc. No. 93.) In support of their motion, the defendants rely both on facts admitted in the Second Amended Complaint and on facts alleged in her prior two Complaints. The defendants also rely on a letter, dated October 10, 2018, along with an accompanying packet of documents, sent from Wanke's counsel to counsel for Invasix regarding Wanke. (Doc. No. 94.) The letter—which consists of 14 pages of text, followed by over 200 pages of exhibits—details Wanke's situation, including a section titled "Heather's Injuries." (*Id.* at 4.) That section includes essentially the same recounting of Wanke's early post-surgery period that she included in her first two versions of her Complaint. The letter states that Wanke almost immediately "knew something had gone terribly wrong" and "remained housebound" seven days after the procedure. (*Id.*) According to the letter, Dr. Goco "shared [Wanke's] concern]" at least as early as July 12, 2017, when Wanke "cried and cried in Dr. Goco's treatment room," to the point that "[n]either the doctor nor his staff could console her." Indeed, according to the letter, "Dr. Goco became so alarmed at [Wanke's] distress, he left a personal voice mail message for her after the July 12, 2017 appointment." (*Id.*) Shortly thereafter, he "offered her a (completely unsolicited) refund for the procedure." (*Id.*) The letter concludes:

6

It is our sincere hope this matter can be resolved quickly, amicably and privately. However, if we do not receive a substantive response to our demand of $500,000 within thirty (30) days, we will be forced to file suit and proceed in the public forum for resolving these types of disputes.

Sincerely,<br>
Amy Davis<br>
[Counsel for Wanke]

(*Id.* at 13.)

The defendants provided an Affidavit by their counsel, Arthur J. Liederman, stating that he received the letter and accompanying materials on or around the letter's October 10, 2018 date. (Doc. No. 94-4 ¶ 3.) Liederman also draws the court's attention to emails and medical records provided by Wanke's counsel as part of the packet, which appear consistent with the account in the letter. (*Id.* ¶¶ 4–5.) For example, a July 12, 2017 progress note from Dr. Goco's office confirms that Wanke, after the procedure, was suffering from "hyperpigmentation." A July 28, 2017 note mentions Wanke's "'Ice-Pick Type' Dimple Scars" and includes the word "REFUND." (Doc. No. 97 at 77, 79.) A refund check from Goco's practice to Wanke, dated August 3, 2017, is also included. (*Id.* at 81.)

On July 27, 2020, Wanke filed an Objection and Motion to Strike Summary Judgment Evidence. (Doc. No. 103.) Wanke objects to the defendants' reliance on her superseded pleadings and the October 10, 2018 letter. She argues that the pleadings are hearsay, should not be attributed to Wanke herself, and are without legal or factual import because they have been superseded. She argues that, because the letter was sent as part of a settlement demand, it is inadmissible for the purposes of establishing a contested issue of liability, including the timing of her discovery of her injury. (*Id.* at 1–2.)

7

On August 6, 2020, Wanke filed her Response to the Motion for Summary Judgment. (Doc. No. 106.) The Response was accompanied by a Declaration by Wanke. (Doc. No. 106-1.) Wanke provides the following account of the post-procedure period:

> 2. I became quite concerned shortly after my June 15, 2017 Fractora procedure that my injury was more severe than anticipated and that my skin looked more, not less, aged. I expressed alarm to my treating physician, Dr. Paulino E. Goco, but Dr. Goco reassured me the procedure had gone normally and that my skin was and would continue healing.
>
> 3. I remained concerned when my wounds and other changes in the texture of my skin persisted months after the procedure. In September 2017, I saw Dr. Natalie Curcio for a second opinion. Dr. Curcio told me that, as expected with any Fractora procedure, the injuries would heal with time. She even encouraged me to undergo a second Fractora procedure to hasten this process.
>
> 4. Despite reassurances that my experience was normal and my skin would likely fully heal, I continued to worry the injuries went beyond those intended by the procedure. I sought a third opinion from Dr. Brian S. Biesman in roughly February 2018. He also encouraged me to be patient. He recommended I wait at least a year after the procedure to assess the condition of my skin. He said any declaration as to whether I experienced an unexpected result with long-term scarring before then would be premature. None of the three doctors I saw in the year after my procedure indicated my injuries could be due to problems with the device or instructions for using the device.

(*Id.* ¶¶ 2–4.)

Consistently with this court's Local Rule 56.01(c), Wanke filed a Response to the defendants' Statement of Undisputed Material Facts, in which she conceded or denied the facts alleged and reasserted her objections based on the admissibility of the underlying evidence. (Doc. No. 107.) The Local Rules provide that, when a party opposing a motion for summary judgment files a response to the movant's statement of undisputed material facts, the party may "contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried." L.R. 56.01(c). Wanke took

advantage of that opportunity and asserted a lengthy collection of additional facts, supported by citation to the record, relevant to the issue of timeliness. (Doc. No. 107 at 12–19.)

When the non-moving party files a statement of additional undisputed facts, "the moving party must file a reply statement responding to each of the additional disputed facts . . . within fourteen (14) days of the filing of the response of the non-moving party." L.R. 56.01(d). The defendants, however, failed to comply with that requirement. It appears, from the briefing, that counsel for the defendants may have been unfamiliar with this aspect of the court's Local Rules.[2] Nevertheless, by failing to comply with the Local Rules, the defendants have conceded the asserted facts, although they will not necessarily be bound to any legal conclusions or mere characterizations included alongside the factual assertions themselves. L.R. 56.01(f).

Specifically, the defendants have not disputed the facts that Wanke has asserted regarding what she was told by Dr. Curcio and Dr. Biesman during her recovery regarding the possibility that she might still fully heal from her procedure. (Doc. No. 107 at 16–17 ¶¶ 28–32.) The defendants also failed to dispute a number of facts regarding when Wanke became aware of InMode's involvement in the production of the Fractora device. For example, Wanke has established, for summary judgment purposes, that, in previous litigation against two Texas-based plaintiffs regarding the Fractora device, which began no later than 2015, "Invasix answered each lawsuit, specifically identifying itself as the 'manufacturer of such medical device.'" (*Id.* at 12 ¶¶ 1–4.) Counsel for Wanke was also counsel for those Texas-based plaintiffs. The defendants have not disputed that "Invasix (and not InMode) defended both suits and, ultimately, settled the claims asserted by the Texas Claimants in late November 2015 and January 2016, respectively." (*Id.* at

---

[2] The Defendants filed a Motion for Leave to Exceed the Page Limit and Time to File Reply, in which the defendants arguably appeared to believe that they would need to rely solely on their reply brief to respond to Wanke's factual assertions, when, in fact, they not only could have, but were required to, file a response to the newly asserted facts as well. (Doc. No. 108 at 2.) The court denied the motion. (Doc. No. 110.)

9

13 ¶ 5.) Again, "[i]n March 2017 and October 2018, Invasix (and not InMode) claimed it had authority to settle and, in fact, resolved (pre-suit) identical product liability (and other) claims asserted by two additional women injured by the Fractora procedure and represented by" the same counsel. (*Id.* at 15 ¶ 16.)

Wanke's counsel also engaged in settlement negotiations regarding Wanke's own claims beginning in October 2018, and "Invasix did not disclose [during those] settlement discussions with [Wanke's] counsel that it no longer assumed responsibility for manufacturing of the device and/or that [Wanke] was mistaken as to the identity of the manufacturer." (*Id.* at 15 ¶ 22.) Instead, Wanke and her counsel first learned that Invasix would deny having manufactured the device and claim, instead, that it merely marketed the device for InMode in the reply brief filed by Invasix in Support of its Motion to Sever and Transfer on July 15, 2019. (*Id.* at 15 ¶ 23.) On July 25, 2019, Wanke's attorney "inquired of defense counsel whether Invasix, in fact, [had] changed its position and, in this litigation, denie[d] manufacturing the product." (*Id.* at 16 ¶ 24.) When Invasix "failed to timely answer this inquiry," Wanke sought and received permission to amend her complaint to add InMode as a party. (*Id.* at 16 ¶ 25.)

## II. LEGAL STANDARD

### A. Motion for Summary Judgment

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see*

10

*also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## B. Objection to Material Cited in Support of Motion for Summary Judgment

A party seeking summary judgment must support its asserted undisputed facts by citation to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). Although the material cited is required only to be "in the record" and is not required, by Rule 56, to be provided in the admissible form anticipated for use at trial, a party opposing the summary judgment motion may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(1).

A summary judgment movant facing an objection on admissibility grounds can overcome that objection by "explain[ing] the admissible form that is anticipated" for presenting the relevant fact at trial. *Mangum v. Repp*, 674 F. App'x 531, 536 (6th Cir. 2017) (quoting Fed. R. Civ. P. 56(c), advisory committee's note to 2010 amendment); *see also Mount Vernon Fire Ins. Co. v. Liem*

11

*Constr., Inc.*, No. 3:16-CV-00689, 2017 WL 1489082, at *3 (M.D. Tenn. April 26, 2017) (Crenshaw, J.) (acknowledging that the court, on a summary judgment motion, may consider evidence presented in hearsay form if the evidence can be reduced to admissible form at trial); *Wilson v. Stein Mart, Inc.*, No. 3:15-CV-01271, 2016 WL 4680008, at *2 (M.D. Tenn. Sept. 7, 2016) (Nixon, S.J.) (same); Jeffrey W. Stempel et al., 11-56 Moore's Federal Practice - Civil § 56.91 (2018) ("Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial.").

## III. ANALYSIS

### A. Choice of Law Regarding Statute of Limitations

#### 1. Applicable Choice-of-Law Test

Typically, when a federal court hears a diversity action, "the law of the forum state, including the choice-of-law rules, appl[ies]." *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009) (citing *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008)). Under Tennessee's choice-of-law principles, "statutes of limitations constitute procedural matters," meaning that the law of the forum state—that is, Tennessee—governs. *SunTrust Bank v. Ritter*, No. E2017-01045-COA-R3-CV, 2018 WL 674000, at *4 (Tenn. Ct. App. Feb. 1, 2018). Under that relatively straightforward rule, this court would typically apply the relevant Tennessee statute of limitations to a cause of action brought in this district pursuant to the court's diversity jurisdiction (presuming, of course, that there was no federal law to the contrary).

Wanke, however, draws the court's attention to a different, more specific principle: that, "when a diversity case is transferred from one federal district court to another, substantive law governing the jurisdiction of the transferor court controls." *Wahl v. Gen. Elec. Co.*, 786 F.3d 491,

12

494 (6th Cir. 2015). The Supreme Court, citing the interests of justice, adopted that rule in order to prevent the 28 U.S.C. § 1404(a) transfer process—which exists merely to further the interests of convenience—to result in any "prejudicial change of [the] law" governing the transferred case. *Van Dusen v. Barrack*, 376 U.S. 612, 625 (1964). In so doing, the Supreme Court specifically expressed its desire to propound a rule that would prevent a defendant from seeking a transfer in order to take advantage of a "shorter statute of limitations." *Id.* at 629. Wanke accordingly argues that this court should treat her claims as governed by California choice-of-law principles and, ultimately, California's relevant statutes of limitations for the underlying causes of action, which range from two to four years in length. *See* Cal. Com. Code § 2725 (express warranty, four years); Cal. Civ. Code 1791.1 (extending express warranty remedies to implied warranty); Cal. Bus. & Prof. Code § 17208 (unfair competition, four years); Cal. Civ. Proc. Code § 338(d) (fraud, three years); Cal. Civ. Proc. Code § 335.1 (personal injury from negligence, two years); *Aoki v. Gilbert*, No. 2:11-CV-02797-TLN-CK, 2014 WL 3689345, at *11 (E.D. Cal. July 23, 2014) (false advertising, three or four years).

Although the defendants did not address the choice-of-law issue in their initial briefing in support of their Motion for Summary Judgment and, instead, merely asserted that Tennessee law applies, they concede, in their Reply, that Wanke is correct that this case is governed by the rule applicable to transferred cases and that, therefore, the court must proceed pursuant to California choice-of-law principles. The defendants argue, however, that doing so simply calls on the court to take a longer path to the same destination, because California's choice-of-law principles mandate the application of Tennessee's statute of limitations here, just as Tennessee's choice-of-law principles would, albeit for somewhat different reasons.[3]

---

[3] Although Wanke argues that the defendants have invoked this argument too late and have therefore forfeited it, the defendants have consistently asserted that Tennessee statutes of limitations apply. The

In her Sur-Reply, Wanke takes her argument a step further and argues that the rule that the law of the transferor court's state governs, in and of itself, dictates that the court apply the California statute of limitations. In other words, Wanke suggests that, because this case was transferred from California, this court must apply California law to the question of timeliness, regardless of whether a California-based federal court itself would have done so. (*See* Doc. No. 116 at 3 (arguing that, because this case is governed by the precedents governing transferred cases, the court is not required "to undertake a choice of law analysis").) This reading of the caselaw is mistaken. The court's duty is to apply California law in the same manner that the transferor court would have applied it, had no transfer taken place. That includes, if appropriate, following California choice-of-law principles, even if they tell the court to follow some non-California state's laws. *See Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990) ("[F]ollowing a transfer under § 1404(a) initiated by a defendant, the transferee court must follow the choice-of-law rules that prevailed in the transferor court."). By doing so, the court prevents the transfer from affecting which state's law will apply. If the court cited the transfer to sidestep, rather than apply, the transferor court's choice-of-law rules, it would directly contradict the purpose of the rule.

Unlike Tennessee courts, "California courts do not use th[e] traditional approach"—that is, the substantive/procedural distinction—when deciding which state's law to follow on "statute of limitations issues." *ABF Capital Corp. v. Costello & Lanahan*, No. A106590, 2005 WL 3514288, at *9 (Cal. Ct. App. Dec. 23, 2005); *accord McCann v. Foster Wheeler LLC*, 225 P.3d 516, 527 (Cal. 2010) ("[T]he earlier methodology for resolving choice-of-law issues has been replaced in this state by the governmental interest mode of analysis.") Instead, "California conflict of laws

---

somewhat more complicated argument that the defendants now raise is merely alternative support for a legal assertion that the defendants had already made in a timely manner. The court, accordingly, finds no waiver or forfeiture and must consider which state's timeliness requirements apply under California choice-of-law rules.

principles treat the statute of limitations in the same manner as any other issue, and the courts of th[e] state do not automatically apply California's statutes of limitations in every case." *Hambrecht & Quist Venture Partners v. Am. Med. Int'l, Inc.*, 46 Cal. Rptr. 2d 33, 39 (Cal. Ct. App. 1995). Those general principles call on the court to take a "governmental interest approach" that requires the court to resolve conflicts between states' laws by "'carefully evaluat[ing] and compar[ing]the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state.'" *McCann*, 225 P.3d at 527 (quoting *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 922 (Cal. 2006)).

Before applying that governmental interest approach, however, the court must make a threshold inquiry. California, like many other states, has legislatively adopted a "borrowing statute" that governs some, but not all, disputes with connections to other states. Pursuant to that statute,

> [w]hen a cause of action has arisen in another State, or in a foreign country, and by the laws thereof an action thereon cannot there be maintained against a person by reason of the lapse of time, an action thereon shall not be maintained against him in this State, except in favor of one who has been a citizen of this State, and who has held the cause of action from the time it accrued.

Cal. Civ. Proc. Code § 361. Only after the court determines that the borrowing statute "does not *require* application" of another state's statute of limitations should the court move on to "consideration of California's generally applicable choice-of-law principles," which may favor California law or may favor the law of the other state. *McCann*, 225 P.3d at 526.

In summary, then, the court's choice-of-law analysis in this case has three potential steps. The first step is to determine which state's choice-of-law rules apply. The parties agree that California's do, because this case was transferred from California. The second step, which is

15

mandated by California statutory law, is to determine whether the borrowing statute applies to any particular cause of action. If the borrowing statute does apply, then the inquiry is over, and the court must apply the statute of limitations of the relevant non-California state (here, Tennessee). Finally, as the potential third step, which only arises if the borrowing statute does not apply, the court turns to California common law, which requires the court to determine which state's governmental interest in its cause of action predominates. Whichever state's governmental interest is stronger will, for a cause of action that falls outside the borrowing statute, provide the applicable statute of limitations.

### 2. Applicability of the Borrowing Statute

"By its terms[,] section 361 applies whenever a cause of action arises in [a state other than California] and would be stale in that state, unless the holder of the cause of action is a California citizen who has held the cause from the time of accrual." *Giest v. Sequoia Ventures, Inc.*, 83 Cal. App. 4th 300, 303 (2000) (emphasis omitted). Wanke is not a citizen of California and has not been one during the relevant time period. The applicability of the borrowing statute therefore depends on whether Wanke's causes of action arose in Tennessee. "Section 361," unfortunately, "does not define the term 'has arisen,'" and the caselaw applying the term often speaks in a high level of generality. *Zacher v. Robinson Helicopter Co., Inc.*, No. B279673, 2017 WL 6333908, at *3 (Cal. Ct. App. Dec. 12, 2017). Most courts have embraced a general rule that, for the purposes of the California borrowing statute, "a tort cause of action arises when the wrongful act is committed, even though damages resulting from the tort w[ere] not sustained at that time, and even though the plaintiff may not know that a tort has been committed." *Dalkilic v. Titan Corp.*, 516 F. Supp. 2d 1177, 1184–85 (S.D. Cal. 2007) (citing *Rash v. Bomatic*, Inc., 2005 WL 503929, *7 (Cal. App. 4 Dist. Mar. 4, 2005)); *accord Stremcha v. Allscripts, Inc.*, No. SA CV 16-2057-DOC

16

(JCGx), 2017 WL 10574371, at *7 (C.D. Cal. Nov. 8, 2017); *but see Stremcha*, 2017 WL 10574371, at *7 (C.D. Cal. Nov. 8, 2017) (observing that some "federal courts applying California's borrowing statute have determined that a tort action 'arises' where the injury occurs") (citing *ChinaCast Educ. Corp. v. Chen Zhou Guo*, No. CV 15-05475-AB (Ex), 2016 WL 6645792, at *4 (C.D. Cal. June 3, 2016), *rev'd*, 727 F. App'x 394, 395 (9th Cir. 2018)). That general rule, though, is not absolute, and the unique features of a particular cause of action may call for an outcome other than the one that would be yielded merely by mechanically identifying the site of the defendant's wrongdoing. *See Zacher*, 2017 WL 6333908, at *3 ("While it is true that in some cases a tort cause of action arises when the wrongful act is committed even though no damages were sustained until later, a wrongful death cause of action is not a typical tort cause of action."). Accordingly, a court "must determine under § 361 when (and where) a cause of action has arisen for each applicable claim asserted" and determine the applicability of the borrowing statute accordingly. *Dalkilic*, 516 F. Supp. 2d at 1185 (internal quotation marks omitted).

The Second Amended Complaint includes seven causes of action. In an attempt to address this already-complicated issue as efficiently as possible, the court will include the causes of action and their elements[4] in the table below:

---

[4] The plaintiffs have not clearly stated which state's laws they seek to rely on for their common law causes of action. Because the plaintiffs have asserted California statutory causes of action, the court will rely on the elements set forth in California law, without prejudice to any determination regarding which state's substantive law should govern the elements of any underlying claim itself. The court, however, is not aware of any relevant differences between the California causes of action and equivalent Tennessee causes of action.

17

|   | Cause of Action | Elements[5] |
|---|---|---|
| 1 | Breach of express warranty | " (1) [T]he seller's statements constitute an affirmation of fact or promise or a description of the goods; (2) the statement was part of the basis of the bargain; and (3) the warranty was breached." *Weinstat v. Dentsply Internat., Inc.*, 103 Cal. Rptr. 3d 614, 626 (Cal. Ct. App. 2010). |
| 2 | Breach of implied warranty | "1. There was a sale of goods; the defendant was the seller, and plaintiff a buyer[.] 2. Defendant [impliedly] warranted the goods sold[.] 3. There was a breach of warranty[.] 4. The breach of warranty caused plaintiff to suffer injury, damage, loss or harm[.] 5. The plaintiff gave defendant timely notice of the breach of warranty." *Scott v. Metabolife Int'l, Inc.*, 9 Cal. Rptr. 3d 242, 250 (Cal. Ct. App. 2004). |
| 3 | California Unfair Competition Statute, Cal. Bus. & Prof. Code § 17200 *et seq.* | The plaintiff "has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. |
| 4 | California False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.* | The plaintiff "has suffered injury in fact and has lost money or property as a result of a violation of this chapter." Cal. Bus. & Prof. Code § 17535. |
| 5 | Common law fraud | "(a) [A] misrepresentation (false representation, concealment, or nondisclosure); (b) scienter or knowledge of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Hinesley v. Oakshade Town Ctr.*, 37 Cal. Rptr. 3d 364, 367 (Cal. Ct. App. 2005). |
| 6 | Negligence | "[D]uty, breach, causation, and damages." *Johnson v. Prasad*, 168 Cal. Rptr. 3d 196, 199 (2014). |
| 7 | Strict Liability | "[A] defect in the manufacture or design of the product or a failure to warn, causation, and injury." *Nelson v. Superior Court*, 50 Cal. Rptr. 3d 684, 687 (Cal. App. 2006). |

Each cause of action has at least some connection to Tennessee, given that Tennessee is where Wanke's injury occurred. Under the aforementioned California caselaw, however, the site of the injury is not necessarily where the cause of action "arose"—although it may be. The court, accordingly, will look more closely at the causes of action themselves to determine whether they actually arose in Tennessee or in another state.

---

[5] Internal quotation marks, citations, and some internal formatting omitted.

Although each claim differs from the others, the claims can be roughly divided into three classes. First are the claims—the court will call them the "Fraud/Warranty Claims"—that are based on alleged misrepresentations about the Fractora made directly and specifically to Wanke and/or the clinic that performed Wanke's procedure—that is, Counts 1, 2, and 5. The second category of claims, which the court will refer to as the "Marketing/Advertising Claims," are those based on the general marketing and advertising of the Fractora device and procedure, which was not directed specifically at any single person or clinic but which may have influenced Wanke or her clinic in the decision to give her the damaging procedure. That category encompasses Counts 3 and 4. Finally, Counts 6 and 7 look to the design of the Fractora itself, under a product liability paradigm. The court will call this last category the "Product Claims."

Based on the court's review of the Second Amended Complaint and the available caselaw, the court concludes that the Fraud/Warranty claims arose in Tennessee for the purposes of the borrowing statute. Regardless of where Invasix (or, for that matter, InMode) was based, these claims arise out of a particular transaction involving a particular Fractora device to be used at one Tennessee clinic. Any fraud or giving of a false warranty involved that purchase and that use.[6] The court, accordingly, concludes that the borrowing statute applies to Counts 1, 2, and 5.

With regard to the Product Claims, at least, there is some relevant caselaw. The California Court of Appeal has held, at least once, that, where a product—in that instance, asbestos—injured a person, the cause of action arose in the state of injury for the purposes of the borrowing statute. *See Cossman v. DaimlerChrysler Corp.*, 133 Cal. Rptr. 2d 376, 380 (Cal. App. 2003), *as modified* (Apr. 30, 2003) (holding that borrowing statute applied to require application of Indiana statute of

---

[6] The court notes that an argument could be made that at least some warranty-based claims should be governed by California's principles for applying the borrowing statute to breach of contract actions. Wanke, however, has not alleged any contractual relationship between her and the defendants.

limitations for claims arising out of asbestos exposure in Indiana). Similarly, the Central District of California has held that a cause of action against the manufacturer of an allegedly harmful medical implant arose where the device was implanted and used. *See Vestal v. Shiley Inc.*, No. SACV96-1205-GLT(EEX), 1997 WL 910373, at *2 (C.D. Cal. Nov. 17, 1997). The Seventh Circuit—applying California choice-of-law rules following a transfer—found that, where Taiwanese citizens were harmed by blood infusions performed in Taiwan with blood that had been improperly processed in California, the borrowing statute applied to borrow the Taiwanese statute of repose. *See Chang v. Baxter Healthcare Corp.*, 599 F.3d 728, 733 (7th Cir. 2010). The pattern appears to be that, when a cause of action is based on the plaintiff's use of a faulty product in his home jurisdiction, that home jurisdiction's statute of limitations or repose applies under the borrowing statute. The court will follow that line of cases with regard to these causes of action and apply the Tennessee statute of limitations.

The Marketing/Advertising Claims present the most difficult case. Wanke argues that, although the record is not yet sufficient to allow the court to know, for sure, whether the defendants directed their marketing and advertising from Invasix's California office, it appears clear that those activities were not directed out of Tennessee. Wanke argues that, applying the general California rule that a cause of action arose, for borrowing statute purposes, where the underlying wrongdoing occurred, the court should hold that the claims arose in whatever jurisdiction was home to the relevant corporate decisionmakers.

On the other hand, while the underlying marketing and advertising may have been directed from another jurisdiction and targeted broadly at a wide population of potential consumers, Wanke's causes of action do not arise out of some general grievance that the defendants advertised and marketed inappropriately. That general wrongdoing, if performed in California, would be the

basis for a California-based enforcement action by the California state government or a California local government, not for a Tennessee-based private cause of action by an individual. *See* Cal. Bus. & Prof. Code § 17204 (authorizing action based on violation of California unfair competition statute by "the Attorney General or a district attorney or," in select situations, other government officials); Cal. Bus. & Prof. Code § 17535 (same with regard to violations of the California false advertising statute). Indeed, if any jurisdiction gave Wanke a cause of action arising merely out of the defendants' general wrongdoing, that cause of action would be outside this court's jurisdiction, due to lack of a particularized injury. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). For Wanke's cause of action to arise, it had to have some connection to *her*.

Wanke's individual claims, therefore, arose out of the particular instances of advertising and marketing that influenced, or at least potentially influenced, the ultimate use of the Fractora device on Wanke herself. There was no cause of action related to advertising or marketing specific to Wanke until, at the earliest, when Wanke first became a Fractora patient. That happened in Tennessee. On balance, the court would likely conclude that the Marketing/Advertising Claims, like the other claims, arose in Tennessee, given the importance of distinguishing between mere *violations* of the relevant statutes and individual *claims* under those statutes. The issue, however, is close.

### 3. Alternative Governmental Interest Analysis

Ultimately, however, the court does not need to resolve whether the borrowing statute would require the court to apply the Tennessee statute of limitations to the Marketing/Advertising Claims, because the court concludes that, even if that statute does not apply, Tennessee's statute of limitations should apply under the governmental interests analysis that pertains to other statute of limitations choice-of-law issues in California. The court, frankly, has its doubts regarding

whether California's approach of weighing governmental interests can be performed with any kind of precision or predictability, and the court's review of California caselaw has not shown to the contrary. Ultimately, however, it is up to California courts and lawmakers to determine that state's approach, and this court's responsibility is merely to apply that approach as faithfully as possible. Doing so, the court concludes that Tennessee's shorter statute of limitations reflects its governmental interest in making the state a hospitable environment for companies to sell their medical products and in which those companies will be able to operate with a relative degree of certainty that they will be unlikely to face unexpected litigation based on old injuries. This government interest, the court holds, outweighs any California interest in allowing plaintiffs to wait an extra year after their injuries become apparent in order to sue.

The Fractora device at issue in this case was purchased for use in Tennessee. The procedure was performed in Tennessee, by a Tennessee physician, on a Tennessee patient who was injured. At stake, ultimately, is the amount of liability risk that a medical device company bears when it extends its market into Tennessee. California's interest in making its own manufacturers subject to greater liability is, while real, more attenuated. The state of California is entirely capable of protecting its own patients and of regulating its own medical device companies, regardless of what statute of limitations applies to Tennessee-based claims.

It is neither this court's place—nor, under California's own laws, the State of California's place—to second-guess Tennessee's decision that, on balance, the state is better served by a shorter statute of limitations that comparatively favors manufacturers and sellers. Indeed, the court holds that the same governmental interests analysis would apply to all of Wanke's claims, even if the borrowing statute did not mandate applying Tennessee law. The statute of limitations for all of Wanke's claims is, therefore, the relevant Tennessee statute of limitations.

## B. Applicable Statutes of Limitations

In Tennessee, an "action[] for . . . injuries to the person" must be "commenced within one (1) year after the cause of action accrued." Tenn. Code Ann. § 28-3-104(a)(1)(A). That provision expressly applies to personal injury actions based on a theory of product liability, which "shall accrue on the date of the personal injury, not the date of the negligence or the sale of a product." Tenn. Code Ann. § 28-3-104(b)(1). The defendants argue that, if Tennessee law applies, then the one-year statute of limitations applies to all of Wanke's claims. Wanke does not suggest any substantive reason why any other Tennessee statute of limitation would apply to her claims, other than her claims based on unfair competition and false advertising. (Doc. No. 106 at 15 (conceding that "Plaintiff's other claims for breach of express and implied warranty, common law fraud, negligence, negligence per se and gross negligence and strict product liability claims arguably fall under that statute of limitations"). She argues, however, that her unfair competition and false advertising claims should not be subject to the same one-year period, because they are not fundamentally about the flaws in the underlying Fractora product, but, rather, the actions of defendants' personnel.

Wanke is misreading Tenn. Code Ann. § 28-3-104. The one-year statute of limitations for product liability actions addressed in Tenn. Code Ann. § 28-3-104(b)(1) does not, in any way, suggest that the one-year statute of limitations set forth in Tenn. Code Ann. § 28-3-104(a)(1)(A) applies only if a plaintiff relies on a product liability theory of recovery. Quite to the contrary, Tenn. Code Ann. § 28-3-104(a)(1) provides a substantial list of causes of action subject to the one-year limitation, many of which have nothing to do with products liability. Tenn. Code Ann. § 28-3-104(b)(1) simply provides some extra detail regarding how that limitation should be applied in product liability cases. Tenn. Code Ann. § 28-3-104(a)(1)(A), however, applies to causes of action

23

based on injury to the person, whether they are product liability-based or not, unless, of course, some more specific Tennessee statute sets a different limit.

If there is any question whether a particular cause of action is for injury to the person, the court "must identify the gravamen of each claim alleged" in order "to determine" whether Tenn. Code Ann. § 28-3-104(a)(1)(A) applies. *Benz-Elliott v. Barrett Enterprises, LP*, 456 S.W.3d 140, 141 (Tenn. 2015). "Identifying the gravamen of a claim requires a court to consider both the legal basis of the claim and the injury for which damages are sought." *Id.* In the Second Amended Complaint, Wanke asserts that the defendants' wrongdoing underlying the unfair competition and false advertising claims was the "proximate cause of [her] injuries." (Doc. No. 89 ¶¶ 85, 92.) While Wanke may have had some purely economic injuries, in the form of paying for the Fractora procedure, the gravamen of her case is plainly for her physical disfigurement. The court, accordingly, will apply the one-year statute of limitations to all of her claims.

## C. Objections/Motion to Strike

Before the court can finally turn to applying the relevant statute of limitations, it must address the evidentiary issue that Wanke has raised. Wanke objects to the defendants' reliance on "superseded pleadings and Federal Rule of Evidence 408 settlement communications, all for the purpose of impeaching" Wanke regarding her claims of when she realized she had been injured by the arguable wrongdoing of the defendants. (Doc. No. 103 at 2.) Wanke also argues that, insofar as her prior pleadings are otherwise admissible, they are hearsay.

As a preliminary matter, Wanke has, as the defendants point out, greatly overstated the scope of her protection pursuant to Rule 408. Rule 408 restricts the admissibility of two types of evidence:

24

> (1) [evidence of a party's] furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and
>
> (2) conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

Fed. R. Evid. 408(a). Many of the materials for which Wanke claims Rule 408 protection, however, are neither evidence of her offer itself nor statements that she or her counsel made during negotiations. Rather, they are simply preexisting documents that happen to have been included in the packet of exhibits included with her demand letter. It would make little sense to allow a party to render an otherwise admissible and relevant document inadmissible simply by including it with a protected communication. Accordingly, even if, for example, the defendants cannot rely, at trial, on the account of Wanke's post-procedure actions included in the text of the letter, there is no bar to their relying on Wanke's otherwise admissible medical records included in the packet, which would be discoverable through ordinary means, whether or not they had been originally turned over as part of a settlement demand.

Wanke is also mistaken that she can render her prior Complaints inadmissible hearsay simply by stating that they were her attorney's words, not hers. As Wanke concedes, Rule 801(d)(2) of the Federal Rules of Evidence makes clear that an out-of-court statement by a party opponent is not hearsay. The Rule, however, also goes a step further and defines a handful of other types of statement as the equivalent of party-opponent statements, even if they do not fall into that literal definition. As relevant to this argument, Rule 801(d)(2)(C) designates, as the equivalent of a statement of a party opponent, any statement that "was made by a person whom the party authorized to make a statement on the subject." There is no evidence that Wanke's attorney was

25

not authorized to file the Complaints. The statements therein are, therefore, covered by Rule 801(d)(2), regardless of whether they are attributed to the attorney or to Wanke.

Even aside from those issues, Wanke's arguments reflect a misplaced emphasis on the specific details regarding when and how the defendants obtained certain information, rather than on the information itself. The fundamental basis of a Rule 56 motion is not evidence *qua* evidence. Evidence is an issue for trial. Rule 56 motions are about *facts*—specifically, facts, supported by citation to the record, that the court is permitted, by the Rules of Civil Procedure, to treat as undisputed, either because the parties actually agree on those facts or because the party challenging the facts has not disputed them sufficiently to persuade a reasonable fact finder. An asserted undisputed material fact needs only to be (1) supported by citation to the record, Fed. R. Civ. P. 56(c)(1), and (2) capable of being presented at trial in some admissible form, Fed. R. Civ. P. 56(c)(1).

For example, the defendants have cited to multiple documents in the record suggesting that, in the immediate aftermath of her procedure, Wanke, in tears, complained to Dr. Goco of her condition, and Dr. Goco observed Wanke's scarring himself and offered her a refund. Maybe some of the cited materials will be inadmissible at trial, but that, for the purposes of Rule 58, is not what ultimately matters. What matters are two questions. First, did the events described actually happen? And, second, is there any way to present evidence of those events at trial? Although Wanke has now put a more favorable spin on the days and months following her procedure, she does not actually deny her earlier version. At trial, moreover, she can be asked about the events directly, and she will, of course, have to tell the truth. Dr. Goco, as well, could be a witness. It would be immaterial whether the same facts also appeared in an inadmissible settlement demand.

26

. Wanke's objections, therefore, are overruled, and her motion will be denied. Most of the documents she challenges as inadmissible are, in fact, admissible. Moreover, regardless of the admissibility of any particular document, she has failed to establish that the defendants will be unable to support their factual assertions with evidence at trial. Wanke avoided dismissal on the pleadings by amending her Complaint, but the facts that she excised from the Complaint are not so easily escaped. Wanke has now had the opportunity to respond to those facts and to refute, if she can, the inferences supported by those facts. The defendants' motion will therefore be decided based on the facts themselves, not the circumstances of how those facts first came to light.

## D. Application of One-Year Statute of Limitations

Wanke entered into her Tolling Agreement on January 23, 2019. The procedure that caused her injury was performed well more than a year earlier, on June 15, 2017. The defendants urge the court to treat those facts as dispositive and hold that her claims are untimely. Tennessee, however, does not assume that every statute of limitations begins to run on the date of the plaintiff's injury. For most causes of action, Tennessee applies the discovery rule, which, as this court has already noted, provides that a cause of action only accrues "when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant." *John Kohl & Co.*, 977 S.W.2d at 532. In other words, the plaintiff must have suffered "legally cognizable damage—an actual injury," and she "must have known or in the exercise of reasonable diligence should have known that this injury was caused by the defendant's wrongful or negligent conduct." *Id.* (citation omitted).

As the Tennessee Supreme Court has explained:

An actual injury occurs when there is the loss of a legal right, remedy or interest, or the imposition of a liability. An actual injury may also take the form of the plaintiff being forced to take some action or otherwise suffer some actual inconvenience, such as incurring an expense, as a result of the defendant's negligent

27

or wrongful act . . . . However, the injury element is not met if it . . . amounts to a mere possibility.

*Id.* (citations omitted). Under the discovery rule, the statute of limitations begins to run, at the latest, when the plaintiff becomes aware that such an injury has been done to her. As the Tennessee Supreme Court explained, however, "[u]nder the theory of constructive knowledge, . . . the statute may begin to run at an earlier date—whenever the plaintiff becomes aware or reasonably should have become aware of facts sufficient to put a reasonable person on notice that an injury has been sustained as a result of the defendant's negligent or wrongful conduct." *Id.*

The plaintiff's knowledge or constructive knowledge, moreover, need not entail a complete understanding of the severity or legal significance of the situation:

> [T]here is no requirement that the plaintiff actually know the specific type of legal claim he or she has, or that the injury constituted a breach of the appropriate legal standard. Rather, the plaintiff is deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury *as a result of wrongful conduct.*

*Id.* at 533 (emphasis added). Accordingly, in this case, it is immaterial when Wanke knew or should have known how severe her injuries were or that the defendants violated any specific legal prohibition; what matters is when she knew or should have known that some wrongful injury had occurred.

As the court observed when considering the defendants' motions to dismiss, applying the discovery rule to an injury caused by a medical procedure or treatment is often difficult, because medical intervention can involve significant pain and suffering, regardless of whether any wrongful injury occurred. *See*, *e.g.*, *Sherrill v. Souder*, 325 S.W.3d 584, 594 (Tenn. 2010) (applying discovery rule to medication side effects); *Shadrick v. Coker*, 963 S.W.2d 726, 737 (Tenn. 1998) (applying discovery rule to effects of surgical screws); *Stanbury v. Bacardi*, 953 S.W.2d 671, 677 (Tenn. 1997) (applying discovery rule to results of foot surgery); *see also Cates*

*v. Stryker Corp.*, No. 3:10-CV-546, 2012 WL 256199, at *3 (E.D. Tenn. Jan. 27, 2012) (applying discovery rule to effects of implanted pain pump). Wanke, moreover, has provided evidence that would likely allow a reasonable fact finder to conclude that it is sometimes difficult for a Fractora patient to know whether she has been wrongfully injured immediately following the performance of the procedure. At issue in this case, however, is not how easy or difficult it *might* be for a hypothetical Fractora patient to perceive her injury. The pending motion depends on what was or should have been apparent to Wanke in her particular case, and the undisputed facts and evidence establish that she was aware that her procedure had gone wrong almost immediately.

Indeed, even according to her most recent version of events—her third telling of those events, and the one polished specifically to support her arguments regarding timeliness—she grew "quite concerned" early in her recovery period and sought medical advice. (Doc. No. 106-1 ¶ 2.) Her medical records confirm that she was scarred and that Dr. Goco considered it appropriate to give her a refund. At that point, Wanke may not have known why her procedure had yielded such an undesirable, unexpected result or how severe any disfigurement would be in the long term. She also presumably did not know about the various allegedly improper marketing tactics that the defendants had employed in the process of carving out a market share for Fractora. Under Tennessee law, however, none of that knowledge was necessary for her cause of action to accrue.

Wanke's position was somewhat similar to that of the plaintiff in the Tennessee Supreme Court's opinion in *Sherrill v. Souder*. In that case, the plaintiff had developed a symptom— specifically, tardive dyskinesia—as the result of medication that she had been prescribed. The Tennessee Supreme Court held that the statute of limitations for suing the prescriber began as soon as she knew that that injury was the result of the medication—even if she did not yet have any actual knowledge that the medication was improperly prescribed or that she had been improperly

29

overseen as a patient following the prescription. *Sherrill*, 325 S.W.3d at 598. The court explained that, even if a plaintiff does not yet have knowledge of the defendant's wrongful conduct, the statute of limitations period begins when she becomes "aware of facts sufficient to place a reasonable person on notice that her [injury] was the result of the Defendants' actions such that she could have discovered the breach of the standard of care through reasonable care and diligence." *Id.* at 596.

More than a year before Wanke entered into the tolling agreement, she was aware that she was experiencing unwanted, serious effects of her Fractora procedure. She was, therefore, fully on inquiry notice regarding anything she could have discovered by reasonably investigating further. As Wanke herself has pointed out, moreover, claims on behalf of other patients had already been brought against Invasix regarding Fractora before Wanke's injuries even occurred. The fact that something was amiss with the device and that injuries it inflicted might be wrongful was therefore presumably discoverable. Even if Wanke's physicians led her to believe that she might ultimately heal, those conversations would, at most, be relevant to the issue of actual knowledge, which Tennessee does not require. In any event, as the court has already noted, Wanke was not required to know whether her injuries were permanent for a cause of action to accrue.

Although the procedural and evidentiary issues implicated by the defendants' motion are unusual, the underlying facts are fairly simple and well within the situations already contemplated by Tennessee caselaw. Wanke had a procedure performed on her. Immediately or almost immediately, she knew that the procedure turned out far worse than she had wanted or expected, such that there was reason to look further into what might have gone wrong. In such a situation, the one-year period for filing a claim begins to run. The court, therefore, will grant Invasix summary judgment, on the ground that all of Wanke's claims against it are untimely.

**E. Fraudulent Concealment and the Claims Against InMode**

Wanke argues, in the alternative, that, even if she should have sued Invasix sooner, her claims against InMode are timely because the defendants fraudulently concealed InMode's identity as a potentially liable party, giving rise to Tennessee's doctrine of tolling based on fraudulent concealment. Under Tennessee law, a plaintiff is entitled to tolling of the statute of limitations if she can establish the following:

> (1) that the defendant affirmatively concealed the plaintiff's injury or the identity of the wrongdoer or failed to disclose material facts regarding the injury or the wrongdoer despite a duty to do so; (2) that the plaintiff could not have discovered the injury or the identity of the wrongdoer despite reasonable care and diligence; (3) that the defendant knew that the plaintiff had been injured and the identity of the wrongdoer; and (4) that the defendant concealed material information from the plaintiff by withholding information or making use of some device to mislead the plaintiff in order to exclude suspicion or prevent inquiry.

*Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 463 (Tenn. 2012) (internal footnotes and quotation marks omitted). Wanke argues that Invasix concealed InMode's identity as a wrongdoer in this case by leading Wanke's counsel to believe that Invasix was the manufacturer of the Fractora device and failing to disclose the actual identity of InMode.

Wanke has asserted sufficient facts to avoid summary judgment on this issue. The defendants have produced nothing to refute Wanke's telling of events—namely, that, over the course of several cases that resulted in settlement, Invasix led and allowed Wanke's counsel to believe that Invasix was the manufacturer of the Fractora device, while Invasix had, all the while, in fact been aware that it was merely marketing a device made by another company. At most, the defendants have identified clues that might have led Wanke to discover the importance of InMode, such as the name "InMode" appearing on product documentation and other materials. As Wanke suggests, however, that name "InMode," as used in the United States, could have been—and indeed may actually have been—simply a d/b/a name of Invasix itself. The facts available at this

31

stage would allow a reasonable factfinder to conclude that reasonable care and diligence would not have allowed Wanke to discover that she was mistaken about the manufacturer of the Fractora device. The court, accordingly, will deny summary judgment with regard to the claims against InMode.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment (Doc. No. 93) will be granted in part and denied in part, and Wanke's Motion to Strike Summary Judgment Evidence and Objections (Doc. No. 103) will be denied. The court will grant Invasix summary judgment with regard to all claims and deny InMode summary judgment with regard to all claims.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge